UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA

                                                    **MEMORANDUM & ORDER**

      -against-

                                                    06 CR 248 (RJD)


MAMIE MANNEH,

                 Defendant.
-----------------------------------------------------X

           For the Government:
                 Benton J. Campbell
                 United States Attorney
                 271 Cadman Plaza East
                 Brooklyn, New York 11201
                 By:  Jonathan E. Green
                       Assistant United States Attorney

           For Defendant:
                 Federal Defenders of New York, Inc.
                 16 Court Street, 3rd Floor
                 Brooklyn, New York 11241
                 By: Jan Alison Rostal


DEARIE, Chief Judge.

     Defendant Mamie Manneh has been indicted under 18 U.S.C. § 545 for importing parts

of certain endangered African primate species without the permit required by the international

treaty protecting those species or the license required of all United States wildlife importers, and

for failing to disclose to border officials the true nature of the product she was importing.   On

her motion pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure to dismiss the

indictment, she claims that by requiring her to comply with these licensing, permitting and

disclosure requirements—and by prosecuting her for failing to do so—the government has

substantially burdened the exercise of her sincerely held religious beliefs in violation of the Free

Exercise Clause of the First Amendment of the United States Constitution as codified by the

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, et seq. At an evidentiary

hearing on the RFRA claim following the initial round of briefing, the Court observed the

testimony of defendant and others, and admitted the extensive body of religious and cultural

scholarship and related secondary literature that defendant offered. Substantial post-hearing

submissions were received as well.

For the reasons that follow, defendant's motion is denied.

## FACTUAL BACKGROUND

### A. The Nature of the Charges

#### 1. Undisputed Facts

The principal facts involving the shipment at issue—what it contained, how it was

labeled, and what the required paperwork (either by declaration or omission) disclosed about its

contents—are not disputed. On January 9, 2006, an air cargo shipment arrived at John F.

Kennedy Airport aboard Royal Air Maroc that was found, upon inspection, to contain primate

parts secreted beneath layers of smoked fish and items of apparel. The shipment, which

originated in the Republic of Guinea, consisted of twelve boxes weighing a total of

approximately 327 kilograms (720 pounds). Inspectors, first from the United States Customs and

Border Protection ("Customs") and then from the United States Fish and Wildlife Service of the

Department of the Interior ("Fish & Wildlife"), found primate parts, or "bushmeat,"

"commingled with" smoked fish and "concealed under the top layers" of fish in "multiple boxes"

of the shipment. Complaint and Affidavit in Support of Arrest Warrant, sworn to February 3,

2006 (the "Complaint") at ¶ 7.[1] In all, inspectors found and seized 65 individual pieces of bushmeat, including skulls, limbs and torsos. Id. ¶ 8.

The shipping and related documents speak for themselves. The airway bill names defendant's cousin in Guinea as shipper and defendant, at her home address in Staten Island, as intended recipient, and none of the documents discloses the presence of primate parts in the shipment. Inter alia, (1) the airway bill, prepared on the shipping end, identified the goods as "Foodstuff," "Smoked Fish/African Wear," and "Perissable"[sic]; (2) the airline's flight manifest, prepared by the airline on the basis of the contents of the airway bill and electronically submitted to Customs in advance of the plane's arrival, described the shipment as containing "Foodstuuf" [sic]; and (3) a third form, a *PPQ Form 368* prepared by Cargo Hut, a freight forwarder engaged by defendant to assist her with customs clearance, was filed with the Animal and Plant Health Inspection Service of the United States Department of Agriculture and listed "eleven cartons" of "smoked fish" and "one carton" of "African dresses."[2]

---

[1] Instead of referring to "primate parts," the Complaint employs the more general term "bushmeat" (the term also employed and apparently preferred by defendant), and explains that "bushmeat is an all-encompassing term used in Africa to describe the meat of wildlife species that have been taken from the wild [sic]. It can be used to describe meat from the smallest of species, such as rodents, to the largest of game animals, such as elephants." Complaint ¶ 1. Defendant's papers similarly describe bushmeat as "a term used in Africa to describe the meat of wildlife species indigenous to the region," as does the government's witness Reverend Roy Bailey ("my understanding of that [term] is raw game; whatever sort of wildlife may be in the forest").

[2] Documents and testimony at the evidentiary hearing establish that defendant had hired Cargo Hut sometime earlier, in or around July 2005, to assist her with shipments from West Africa, and had signed the necessary power of attorney form authorizing Cargo Hut to process her shipments and directing the firm to comply with all existing regulations. The shipment that is the subject of this prosecution is either the third or fourth that Cargo Hut handled for defendant. In a proffer, Cargo Hut asserts that it made the decision to file *PPQ Form 368*, and to describe the goods as it did, on the basis of the descriptions in the airway bill and flight manifest.

## 2. The Specific Laws that Defendant Violated

Particularizing the general "contrary to law" language of Section 545 and the indictment,[3] the government points to several laws that together delineate the paperwork trail an importer must follow in order to import primate parts. The seminal provision is an important international treaty that regulates the trade of certain wildlife species believed to be in danger of extinction, the *Convention on International Trade in Endangered Species of Wild Fauna and Flora* ("*CITES*" or "the Convention"), 27 U.S.T. § 1087, signed by the United States and 160 other nations.[4] The Convention categorizes species according to the perceived level of threat to their survival, as follows: (i) those in Appendix I are "threatened with extinction," and trade in specimens of these species "must only be authorized in exceptional circumstances;" (ii) species in Appendix II are those which, "although not necessarily now threatened with extinction, may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival"; and (iii) those in Appendix III are "already

---

No criminal charges have been brought against Cargo Hut.

There was apparently one additional level of delegation: according to Cargo Hut's proffer, Cargo Hut itself engaged the services of local customs broker who is licensed to file entry documentation for international shipments. The particulars of these various delegations are not material to the RFRA claim.

[3] The indictment, dated April 14, 2006, charges that on or about January 9, 2006, defendant "did knowingly, intentionally and fraudulently import and bring into the United States merchandise contrary to law, to wit: a quantity of primate parts," in violation of 18 U.S.C. § 545. Section 545, captioned "[s]muggling goods into the United States," makes it a crime to "fraudulently or knowingly import[] or bring[] into the United States, any merchandise contrary to law."

[4] The treaty is also known as the Washington Convention, T.I.A.S.(Treaties and Other International Acts Series) 8249. See 50 C.F.R. § 23.1.

subject to regulation in particular jurisdictions" and "need[] the cooperation of other parties [to] control" their trade. 27 U.S.T. § 1087, Art. II, 1-3. Forensic tests confirmed that the primate parts found in the seized January 9 shipment addressed to defendant contained specimens of two different Appendix-II species from the primate family *Cercopithecidae*—hamadryas baboons (*Papio hamadryas*) and green monkeys (*Chlorocebus aethiops sabaeus*).

Article IV of the Convention outlines the requirements for trade in Article-II species. It provides, inter alia, that "export of any specimen of a species included in Appendix II shall require the prior grant and presentation of an export permit," and that the import of any such species, likewise, "shall require the prior presentation of either an export permit or a re-export certificate." Id., Art. IV. This Article also delineates the prerequisites for the issuance of such permits: in brief, the nation of export must be satisfied that the export will not be detrimental to the survival of the species and that the specimen was not obtained in violation of that nation's laws; the nation of import must make comparable determinations, and must also be "satisfied that the specimen was imported . . . in accordance with the provisions of the [] Convention." Id.

The United States has implemented the Convention through the Endangered Species Act, 16 U.S.C. § 1538(c)(1) ("[i]t is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention"), and regulations promulgated by Fish & Wildlife at Part 23 of Title 50 of the Code of Federal Regulations ("Part 23"). See 50 C.F.R. § 23.1(c) ("We, the U.S. Fish and Wildlife Service, implement *CITES* through the Endangered Species Act"); § 23.1(a) ("[t]he regulations in this part implement [*CITES*]"); and § 23.13 (a) (it is "unlawful" to "[i]mport, export, re-export, or engage in international trade with any specimen of a species listed in Appendix I, II, or III of

5

*CITES*" unless the license and permit requirements are satisfied).

Part 23 begins with several provision that, in quite accessible language, index the ensuing regulations and guide would-be importers through the licensing and permit process. See, e.g., §23.1 (titled, "*What are the purposes of these regulations and CITES?*"); § 23.2 ( a decision tree entitled, "*How do I decide if these regulations apply to my shipment or me?*"); § 23.3 ("*What other wildlife and plant regulations may apply?*"); § 23.7 ("*What office do I contact for CITES information?*" (which includes telephone numbers and web addresses); and §23.20 ("*What documents are required for international trade?*"). Other Part 23 regulations explain the basic categories of species reflected in the three *CITES* appendices. See 50 C.F.R. § 23.4 ("*What are Appendices I, II and III?*").

According to the government and the Court's own assessment of the regulatory scheme—within which, the government claims, are the predicate provisions giving rise to the "contrary to law" prosecution under Section 545—four principal steps appear to be required of any individual seeking to import specimens of Appendix-II species (some are *CITES*-specific, while others apply to importers generally). First, the importer must obtain a *CITES* export permit from the country of origin of the wildlife in question. See 50 C.F.R. § 23.20(e).[5] Second, the importer must obtain a Fish & Wildlife "import/export license," a requirement imposed even on

---

[5] This subsection, captioned "*Import permits, export permits, re-export certificates, and certificates of origin,*" provides that, unless a CITES exemption applies (none does here), an importer "must obtain the following CITES documents before conducting the proposed activity," and lists, for Appendix III species, an "export permit (§ 23.36) or re-export certificate (§ 23.37)." 50 C.F.R. §23.20(e).

importers of animals not covered by *CITES*). See 50 C.F.R. §§ 14.91(a) and (c)(7)).[6] Third, in

addition to the entry documents (principally, Form 3461) that any importer must file with

Customs, on which a truthful declaration of the shipment's contents must be made, wildlife

importers must also separately declare the shipment to Fish & Wildlife on that service's own

form, the *Declaration for Importation or Exportation of Fish or Wildlife,* known as *Form 3-177.*

50 C.F.R. § 14.61. Section 14.61 states the filing requirement in plain language—in pertinent

part, that "importers or their agents must file with [Fish & Wildlife] a completed *Declaration for*

*Importation or Exportation of Fish or Wildlife (Form 3-177)*, signed by the importer or the

importer's agent, upon the importation of any wildlife at the place where [Fish & Wildlife]

clearance . . . is requested." Id. *Form 3-177* conspicuously requests the importer's *CITES* permit

number, along with other information contained in a properly issued *CITES* permit. The Form

further states that providing the requested information is mandatory, and that the importer (or

agent) must certify that the information furnished is true and complete to the best of his/her

knowledge and belief. See 50 C.F.R. § 14.61. Finally, the importer must present to Fish &

Wildlife all the required paperwork, including the *CITES* export permit, the Fish & Wildlife

import/export license and *Form 3-177*, and make the shipment available for inspection. See 50

C.F.R. § 14.52(a).[7]

---

[6] Paragraph (a) of section 14.91makes it "unlawful for any person to engage in business as an importer or exporter without having first obtained a valid import/export license" from Fish & Wildlife, and paragraph (c)(7) includes among the "persons required to be licensed" those who import wildlife for commercial purposes "[i]n the form of food products taken from populations of non-domesticated animals." 50 C.F.R. § 14.91 (a), (c)(7).

[7] Section 14.52(c) provides that, "[t]o obtain clearance, the importer, exporter or [her] agent" must present, inter alia, all shipping documents (including labels and waybills), all permits, licences or other documents required by the laws of the United States, and all permits or

### 3. Fish & Wildlife's Interview and Search[8]

On January 13, 2006, the morning after the shipment was seized, Fish & Wildlife agents telephoned defendant, who confirmed that she had learned from Cargo Hut of a problem involving her shipment from Guinea. She consented to meet with the agents at her home. During the interview later that day, defendant disclosed basic facts about herself not in dispute, including that she was from Liberia, had been living in the United States for twenty years, and for the past several months had been operating a business from her home that involved importing and reselling smoked fish from Africa. With regard to the seized shipment, defendant acknowledged that she had ordered and paid for a shipment of smoked fish and dresses, but denied knowing about the bushmeat in the shipment, blaming that on the exporter in Africa, her cousin Morris. Defendant then provided a detailed account that, according to the agents' report, was of questionable veracity.

Her previous shipments from Guinea, she explained, had been from a different supplier who, she believed, had shorted her, and neither involved bushmeat. She had then turned to her

---

other documents required by the nation of export or by any foreign country. 50 C.F.R. § 14.52(c)(1)-(5).
    There exist other requirements not apparently material to the present motion. Among other things, before the shipment of any item of "food," the manufacturer or packer must be registered with, and provide notice of arrival to, the Food and Drug Administration, see 21 C.F.R. § 1.225, and if the food is perishable, the importer must provide notice to Fish & Wildlife at least 48 hours before arrival. 50 C.F.R. § 14.54(a). For shipments arriving by air, cargo information must be sent to Customs electronically no later than four hours before the shipment's arrival. 19 C.F.R. § 122.48a(b)(2).

[8] The Court relies here on the Redacted Report of Special Agents Alegranti and Marek, dated January 13, 2006, including their "Interview of Manneh" and "Search of the Detached Garage," made part of the record by defendant as Exhibit B to her initial brief in support of her RFRA claim.

cousin, she continued, whom she asked to purchase some fish and traditional African clothing on her behalf. She stated that she had sent her cousin a Moneygram to cover the costs of the goods and shipping, but also stated that she did not know where the Moneygram receipt was. Defendant specifically stated that she had not instructed her cousin to include meat in the shipment, and then stated that after learning that the shipment had not been cleared at Kennedy Airport, she had telephoned Morris and told him that he had "messed up," meaning that he had created trouble for her with law enforcement. She further stated that Morris was in Liberia but had traveled to Guinea to acquire the fish.

There came a point when one of the agents told defendant that an inspector who had opened her shipment had been cut by the contents and that, because of the possible medical implications, it was important to know the country of origin of the meat. Defendant then told the agents that the meat came from Guinea, not Liberia, but still insisted that she did not know what kind of meat it was. When the agents asked whether she knew what bushmeat was, defendant responded that yes, she did.

Defendant then recounted to the agents details of the conversations she had had before meeting with them. She admitted, among other things, that she had learned during an early afternoon telephone call with Cargo Hut that bushmeat had been found in her shipment, that she had spoken to Morris several hours later by telephone, and that he had told her he had included bushmeat and antibiotics in the shipment.

Defendant told the agents that she had seen and eaten bushmeat when she visited her family in Liberia, and that she had never seen African bushmeat in the United States, although she heard that it was sometimes sold at a market in the Bronx and at another on Victory

9

Boulevard in Staten Island. When agents told her that parts of her story were difficult for them to believe, particularly the notion that someone would mix bushmeat into a shipment of fish she had paid for without clearing it with her first, or that she could be in the African food business and yet never have seen bushmeat in the United States, defendant swore that everything she said was absolutely true.

Defendant also told the agents that she stored smoked fish in her detached garage, and then signed a consent allowing the agents to search the unit. Defendant was present throughout the search, during which agents discovered a black bag containing bushmeat and then discovered additional bushmeat inside several boxes that the defendant was attempting to move during the course of the search; in all, agents found 33 pieces of bushmeat in defendant's garage. Once back inside the house and confronted with the discovered bushmeat, defendant admitted that she had been making false statements earlier in the interview and that she had been trying to conceal the boxes that contained bushmeat. She further told the agents that one of the discovered items, a primate arm, was "monkey," and that the bushmeat was from Africa. She denied, however, that she had imported the bushmeat, claiming it came from a woman in Minnesota, and that it was "sent as a gift from god in heaven."

Defendant has not been charged with any crime relating to the bushmeat found in her garage. Furthermore, the government advises that defendant could have been, but was not, charged with illegal importation of warthog, another species of wild animal found inside the seized shipment.

### 4. The Theories of the Parties

According to the government, defendant's importation of primate parts was "contrary to

10

law" under 18 U.S.C. § 545 in that (1) she failed to obtain or even apply for the *CITES* export permit; (2) she failed to obtain or even apply for the Fish & Wildlife commercial import/export license that was required regardless of whether the shipment contained *CITES*-protected species; and (3) she failed to file Fish & Wildlife *Form 3-177*, required of any importer of *CITES*-covered species. Defendant does not dispute these factual assertions.

The government further claims, however, that each of these omissions was purposeful and in furtherance of defendant's goal of concealing the presence of endangered African wildlife in the shipment entering the United States (and thus amount to the crime of "smuggling" defined by Section 545). In this respect, the government identifies yet another provision of law that the shipment was "contrary to," namely, the prohibition against deceptive labeling contained in the Lacey Act, 16 U.S.C. § 3372(d). Like the requirement of 50 C.F.R. § 14.61 that commercial importers of non-domesticated-animal products be licensed, the truth-in-labeling requirements of the Lacey Act are not limited to the those trading in *CITES*-protected species but apply to wildlife-importers generally: the Act makes it "unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any . . . wildlife" that has been or is intended to be "imported, exported, transported, sold, purchased or received from any foreign country." 16 U.S.C. § 3372(d). In further support of the concealment claim, the government also points to the failure of defendant or any of her agents to declare, on any of the forms that were filed, that bushmeat was in the shipment.

Both before and throughout the litigation of her RFRA claim, defendant has asserted numerous defenses unrelated to her claimed religious beliefs that go directly to the question of her guilt. Among other things, she vigorously disputes that she acted with the *mens rea* required

11

for a Section 545 conviction, arguing, <u>inter alia</u>, (1) that the use of the word "Foodstuffs" was sufficient disclosure and in fact did trigger an inspection, albeit not by Fish & Wildlife; (2) that she is guilty, at most, of filing the wrong form, an act she characterizes as mere inadvertence; and (3) that her engagement of Cargo Hut and delegation of plenary authority to that firm somehow evidence her good faith intent to comply with the paperwork regulations.

Further still, defendant has zealously asserted what she calls a "void-for-vagueness" claim resting on the fact, not refuted by the government, that this is apparently the first-ever prosecution involving the importation of bushmeat. She also makes arguments based on the asserted dormancy of the regulations and their uneven administration, complaining that Fish & Wildlife has not adequately educated the West African expatriate community about *CITES* paperwork requirements and has in fact misled much of the public into believing that the import of bushmeat was so strongly discouraged it was effectively banned. (Defendant, of course, has not proven any of these accusations, and indeed, the apparent user-friendliness of the Part 23 roadmap regulations mentioned earlier tends to suggest otherwise, although the question need not be decided here). Finally, the defense has made a zealous appeal to the government to simply re-exercise its prosecutorial discretion and either defer or drop this prosecution, making not only a David-Goliath claim but also asserting that defendant suffers from emotional and cognitive limitations (although not rising to the level of incompetence to stand trial).

From among this arsenal of strategies there eventually emerged a Religious Exercise claim, nearly a year after the seizure at Kennedy Airport and defendant's arrest, during the sixth

appearance of counsel in this case.[9]   Significant labors, including a protracted evidentiary

hearing and extensive briefing, were then devoted to litigating whether bushmeat has religious

significance for defendant, while the exact contours of defendant's claim itself underwent

material changes.  Defendant initially pressed a constitutional theory she described as an "as

applied" challenge solely addressed to the enforcement against her of the license and permit

requirements, then announced that she was pursuing a broad "facial" challenge to the underlying

licensing and permitting scheme (which she had not in fact availed herself of), and eventually

returned, during the final in-court argument, to her original "as applied" theory.  During the

"facial" challenge" chapter, however, extensive briefing and judicial attention were needlessly

diverted to the question of standing, eventually rendered moot by defendant's abandonment of

her "facial challenge" theory.  (See additional discussion of the standing litigation *infra* at pp.

28-30).

## DISCUSSION

### A.  Standard on a Rule 12 Motion

Rule 12(b)(2) allows a party to "raise by pretrial motion any defense, objection, or

request that the court can determine without a trial of the general issue."  Fed.R.Crim.P. 12(b)(2).

In deciding a 12 (b)(2) motion to dismiss, a court must accept all facts alleged in the indictment

as true.  Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952).  Rule 12 also

provides that "[w]hen factual issues are involved in deciding a motion, the court must state its

essential findings on the record."  Fed. R. Cr. P. 12(d).

---

[9] Following defendant's arraignment in March 2006, the parties appeared for status
conferences in June, August, October and November; at the fifth conference, in December 2006,
defense counsel first alerted the Court to the possibility of a Free Exercise issue in the case.

## B. RFRA: Basic Principles

RFRA provides that "Government shall not substantially burden a person's sincere exercise of religion even if the burden results from a rule of general applicability" unless it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a),(b). Congress passed RFRA in response to Employment Division, Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), which held, in a departure from earlier Supreme Court precedent, that laws of general applicability that incidentally burden religion do not trigger strict scrutiny under the Free Exercise Clause of the First Amendment. Smith, 494 U.S. at 883-90. RFRA expressly reinstates and codifies the compelling interest standard of Free Exercise analysis that the Supreme Court applied before Smith.[10] Thus, "prior case law is central to the understanding of the compelling interest test," Adams v. Comm'r of Internal Revenue, 170 F.3d 173, 177 (3d Cir. 1999), cert. denied, 528 U.S. 1117 (2000), with courts regularly using pre-Smith cases to analyze RFRA claims. Id. at 180 n. 7 (collecting cases). Although the Supreme Court held that Congress exceeded its authority in making RFRA applicable against state and local governments, City of Boerne v. Flores, 521 U.S. 507 (1997), the Court also confirmed RFRA's validity as applied to actions of the *federal* government. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,

---

[10] RFRA provides that its "purpose" is "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb(b).

546 U.S. 418 (2006).[11]

RFRA authorizes any "person whose religious exercise has been burdened" in violation of the statute to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." Id. Defendant's RFRA claim requires the Court to engage in a burden-shifting analysis. Gonzales, 546 U.S. at 428-29. Defendant must first demonstrate that the government (1) substantially burdened (2) a sincere (3) exercise of religion. 42 U. S. C. § 2000bb-1(a), (c). If the defendant satisfies her prima facie case, then the burden shifts to the government to demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that government interest." 42 U.S.C. § 2000bb-1(b).[12]

## C. "Exercise of Religion"

### Legal Standard

Under RFRA, "exercise of religion" is defined by cross reference to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). As the Supreme Court taught long ago, "a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972). Although "[t]here is no doubt that

---

[11] On February 16, 2006, five days before the Supreme Court handed down Gonzales, the Second Circuit had ruled similarly. See Hankins v. Lyght, 441 F.3d 96, 106 (2d Cir. 2006) ("We join the other circuits in holding that the RFRA is constitutional as applied to federal law under the Necessary and Proper Clause of the Constitution.")

[12] To "demonstrate" under RFRA means to "meet[] the burden of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3).

only beliefs rooted in religion are protected by the Free Exercise Clause," Frazee v. Ill. Dep't of Employment Sec., 489 U.S. 829, 833 (1989) (citing Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 713 (1981), and that "[p]urely secular views do not suffice," Frazee, 489 U.S. at 833, the task of distinguishing between the religious and the secular can pose seemingly insurmountable semantic obstacles, for what is "religious" may readily be characterized as an earnestly adopted way of life, an inherited cultural practice, an ardently held philosophical belief, or a personal choice reflecting deep and abiding convictions of conscience.[13]

For this reason, the Second Circuit has emphasized, courts are "singularly ill-equipped to sit in judgement on the verity of an adherent's religious beliefs." Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984) (reviewing Supreme Court authority). The "function of the judiciary in determining whether beliefs are to be accorded first amendment protection" is, therefore, "limited." Id. Similar pronouncements are frequent in Free Exercise jurisprudence. See, e.g., Smith, 494 U.S. at 887 ("What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith?"); Eatman v. United Parcel Service, 194 F. Supp.2d 256, 268 (S.D.N.Y. 2002) ("Courts [are] congenitally incapable of judging the religious nature of an adherent's beliefs based on their content").

It is because of "this profound limitation" that the judiciary's "competence extends to

---

[13] For example, in Yoder, when holding that a Wisconsin law compelling school attendance beyond eighth grade interfered with the religious practices of the Amish, the Supreme Court agreed that "the Amish religious faith and their mode of life are . . . inseparable and interdependent." 406 U.S. at 216. The Court also explained that the result in Yoder would have been otherwise "if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond." Id. Thoreau's choice, the Court explained, was "philosophical" and "personal," rather than religious. Id.

determining 'whether the beliefs professed by a [claimant] are sincerely held and whether they are, *in his own scheme of things*, religious.'" Patrick , 745 F.2d at 157 (emphasis added) (quoting United States v. Seeger, 380 U.S. 163, 185 (1965)). This inquiry is understood to be, without qualification, a highly "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." Patrick, 745 F.2d at 157 (citing Thomas, 450 U.S. 707, 713-15 (1981)). See also Ford v. McGinnis, 352 F.3d 582, 589 (2d Cir. 2003) (noting that "Supreme Court's opinion in Frazee mirrored [the Circuit's] approach to free exercise claims previously articulated in Patrick," and confirming use of "subjective test" to determine "religious belief"). Furthermore, "[b]y limiting the factfinder's inquiry to a determination whether 'the beliefs professed . . . are, in [the claimant's] own scheme of things, religious,' it follows concomitantly that the claim of the adherent 'that his belief is an essential part of a religious faith must be given great weight.'" Patrick, 745 F.2d at 158 (quoting Seeger, 380 U.S. at 184)). Courts must be vigilant to "avoid any test that might turn on 'the factfinder's own idea of what a religion should resemble.'" Philbrook v. Ansonia Bd. of Education, 757 F.2d 476, 482 (2d Cir. 1985) (quoting L. Tribe, *American Constitutional Law* § 14-11 at 861).

The definition of religion is not only subjective but also "expansive," Patrick, 745 F.2d at 158, and includes "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." Id. (quoting W. James, *The Varieties of Religious Experience* 31 (1910)). In sum, even "impulses prompted by dictates of conscience as well as those engendered by divine commands are therefore safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature." Patrick, 745 F.2d at 158.

17

Holdings of the Second Circuit reveal these to be not shallow or grandiose pronouncements but principles adhered to emphatically and unflinchingly. See, e.g., Ford, 352 F. 3d at 590 (holds that district court erred when it assessed the objective validity of Ford's belief that the Eid ul Fitr feast continued to carry religious significance even when postponed); Jackson v. Mann, 196 F.3d 316, 317-21 (2d Cir. 1999) (district court dismissed religious exercise claim of inmate, who self-identified himself as Jewish and requested Kosher diet, because prison rabbi opined that inmate was not objectively a Jew; Circuit reversed and required a hearing, holding that free exercise question turned on whether beliefs are "sincerely held," not on the "'ecclesiastical question' whether he is in fact a Jew under Judaic law"); Jolly v. Coughlin, 76 F.3d 468, 476 (2d Cir. 1996) (where Rastafarian inmate refused prison-mandated test for tuberculosis on ground that it was a sin to take artificial substances into his body, and objective evidence showed the test used natural, not artificial proteins, Court nonetheless refused to evaluate objective reasonableness of inmate's belief).   The only apparently "limiting principle" the Supreme Court has offered to assist lower courts in applying the broad, subjective test is its recognition that, "an asserted belief might be 'so bizarre, so clearly non-religious in motivation, as not to be entitled to protection under the Free Exercise Clause.'" Frazee, 489 U.S. at 834 n. 2 (internal citation omitted).

### Analysis

Basic facts about defendant's background are not disputed for purposes of this motion. Among other things, defendant is a thirty-nine year old Liberian citizen who has lived in the United States since she was seventeen years old, becoming a permanent resident at the age of twenty-two. Before her arrest, defendant lived in a part of Staten Island colloquially known as

"Little Liberia" for its high concentration of Liberian immigrants. Defendant's ethnic background is Bassa and Kru, two of the many tribal groups in Liberia. She is one of between twenty and thirty siblings (large families with multiple wives is a Bassa custom), and has raised eleven children of her own, most of whom are biological, the others adopted refugees. After working in the United States for more than ten years as a home health aide, approximately three months before her arrest defendant began a for-profit business importing and reselling food products from West Africa. She has limited formal education.

Most of the library of secondary literature that the defense submitted addresses African religions generally but very little bears directly on the claimed *religious nature* of bushmeat. In any event, the critical inquiry looks at what is "religious" in defendant's "scheme of things," and on that subject, defendant offered her own testimony, the testimony of her aunt (who belongs to defendant's congregation), and a two-page affidavit cosigned by defendant and eighteen other members of her congregation ("Def. Aff.").

Defendant testified that she regularly attended services, conducted in both English and Bassa, at the First Christian Church located near her home in Staten Island. The congregants, mostly West African, describe themselves as "Christians who believe in Jesus Christ as [their] personal savior" but who "also follow the spiritual traditions from [their] African homeland." Def. Aff. ¶ 2. They attest that bushmeat "is something of [their] heritage, as it was part of [their] lives growing up in [their culture] and in [their] spiritual development." Def. Aff. ¶ 4. They explain that:

> Bushmeat is sacred to us because it is of the free wild animals of our homeland, and these animals are gifts from God and filled with spiritual power. When we eat bushmeat, we get closer to God and we take in that spiritual power to our bodies [sic]. This is something our forefathers did, it is something we

19

learned as children, and it is part of our treasured relationship with God as African Christians.

Id.

The congregants further explain that before bushmeat is consumed (which usually occurs on holy days such as Easter, Christmas, Passover, births and weddings), the congregants must first "prepare" by "being holy" (through fasting or praying), and the meat must first be blessed by a reverend. Def. Aff. ¶ 5. The congregants claim that they "cherish" bushmeat "as a spiritual blessing" and that they "eat bushmeat for [their] souls." Def. Aff. ¶ 6.

Much of defendant's testimony essentially tracked the assertions in the congregants' affidavit. In addition, defendant stated that "all [her] life" she has been "using monkey as a sacrifice," Tr. Aug 3. 2007 at 20, and specifically recalled that, during her "baptizing ceremony" when she was seven years old and still living in Liberia, her grandmother had used bushmeat. Finally, defendant testified concerning a videotape played during the hearing that apparently depicts members of her congregation participating in a fast-ending ritual at their church. According to counsel, the tape exhibits a prototypical religious use of bushmeat, although neither counsel, nor defendant herself, was certain whether bushmeat was present during the particular ceremony that was filmed.

The testimony of defendant's aunt, Frances Yarlata, largely corroborated the general assertions defendant made about bushmeat. Yarlata also read to the Court several passages from the Old and New Testament that, in her view, establish the religious significance of bushmeat. The passages include verses from Genesis in which, according to Yarlata, God directed humans to have dominion over meat, and verses from Acts of the Apostles in which, according to Yarlata, Peter is commanded to kill and eat "all manner of four-footed beasts" and "wild beasts

and creeping things." Tr. Aug. 30, 2007 at 54, 56. When asked why these passages "gave [her] the right to eat monkey meat," Yarlata testified, "[b]ecause it make us healthy. It make us strong." Tr. Aug. 30, 2007 at 58.

Without reaching any arguably ecclesiastical question, and notwithstanding the Court's concerns with defendant's sincerity as a general matter in this litigation (discussed more fully *infra* at 23 et seq.), the controlling authorities reviewed above so limit this Court's authority on the question that it has little choice but to accept the testimony of defendant and her co-congregants tending to support the claim that, in defendant's "scheme of things," Seeger, 380 U.S. at 185—that is, for a certain group of West African expatriates and persons of West African descent of which defendant considers herself a member—consumption of "bushmeat" can at times have religious significance.

Were the Court's authority on the question of religion not so constrained it might well conclude otherwise. For example, as the government understandably argues, the record as a whole establishes that the consumption of bushmeat reflects forms of expression that can best be described as cultural, philosophical and nutritional (including, for example, West African expatriates' sincere desire for food from their homeland) rather than religious. Yoder, however, which controls here, teaches that elements of religious faith and a secular mode of life can be, as the Court found they were for the Amish, inseparable and interdependent. 406 U.S. at 216. Likewise, although defendant identified the current "reverend" of her church (a Reverend Roberts), he was *not* called to confirm her claims of bushmeat's role in her church, whereas the government did offer testimony from the church's former pastor, a Reverend Roy Bailey, who disputed the basic verity of the claim that bushmeat has religious significance in defendant's

church. But the weight of authority in this Circuit (including <u>Patrick</u>, <u>Ford</u>, <u>Jackson v. Mann</u>, and <u>Jolly v. Coughlin</u>) essentially exempts the question of religious exercise from such so-called "objective" measures or "official" standards.

## D. "Sincerity"

### Legal Standard

While the question of "sincerity" in the religious exercise context is understood to be "exceedingly amorphous," <u>Patrick</u>, 745 F. 2d at 157, and while it may understandably appear to overlap with the test for what is "religious" inasmuch as that test examines the private and subjective (i.e., one's "own scheme of things," <u>Seeger</u>, 380 U.S. at 185), sincerity remains a discrete element in RFRA and Free Exercise analyses. As distinguished from separating what (in the claimant's scheme of things) is religious from what (in that same scheme) is secular, "[s]incerity analysis seeks to determine an adherent's good faith in the expression of his religious belief." <u>Patrick</u>, 745 F.2d at 157. Sincerity analysis "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud," and requires a factfinder "to delve into the claimant's most veiled motivations." <u>Id.</u> Thus, assessing sincerity "demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination." <u>Id.</u> Outlining factors that indicate insincerity, the Second Circuit noted that "an adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief . . . or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind the veil of religious doctrine." <u>International Soc. for Krishna Consciousness, Inc. v. Barber</u>, 650 F.2d 430, 441 (2d Cir. 1981).

In short, while courts may be poorly equipped to determine what is religious, they are seasoned appraisers of the "motivations" of parties and have a duty to determine whether what is professed to be religion is being asserted in good faith.

### Analysis

Having "observe[d] the claimant's demeanor during direct and cross-examination," Patrick, 745 F.2d at 157, and having thus "delve[d] into the claimant's most veiled motivations," id., the Court finds that defendant has not met her burden on sincerity. Even accepting, as the Court must, that consumption of bushmeat has religious significance somewhere in defendant's "scheme of things," Seeger, 380 U.S. at 185, the Court finds that defendant's religious exercise claim is, as a factual matter, incidental to this prosecution and thus not a sincerely held religious belief, for purposes of RFRA, sufficient to exempt her from the crime she has committed. Nothing in the record supports the particular claim that is essential to defendant's effort to dismiss the indictment, namely, that her failure to obtain a CITES permit or import license and her failure to disclose the true nature of her cargo were the result of her religious beliefs.

To return to first principles unfortunately obscured by the evolving and shifting nature of defendant's claims in this case: defendant is invoking the Free Exercise Clause of the First Amendment *as a defense to a criminal prosecution*, so there must necessarily be some nexus between the indicted conduct and the defense offered to exempt that conduct from the otherwise fully applicable laws. It is undisputed that none of the laws that defendant is claimed to have violated bans the importation of bushmeat.[14] It is also undisputed that the *actus reus* of

---

[14] As to any earlier remarks of the Court with respect to the possibility that the laws in question created a *de facto* ban, see discussion *infra* at 28-9.

23

defendant's crime lies in the disclosures made or not made on forms that she (through her agents) filed or failed to file, and there is not an iota of evidence suggesting any nexus between these acts and defendant's asserted religious beliefs. Defendant did not, for example imply that she had "religious permission" (i.e., from God) to import the bushmeat and so did not need to submit to secular permitting requirements, nor did she suggest that she was placing her religious concerns ahead of possible secular consequences. In short, defendant did not testify or argue that her "paperwork shortcomings" stemmed from a religious aversion to the forms, that her religion required her to abstain from truthful completion of the paperwork, or that filing the wrong or incomplete forms was, for her, a religious act. Cf. United States v. Tawahongva, 456 F. Supp.2d 1120, 1131 (D. Ariz. 2006) (Native American charged with failing to obtain a permit before taking golden eagles testified not only that use of eagles was necessary to fulfill his religious responsibilities *but also* that his "permission to take eagles [was] conferred by . . . the tenets of his religious faith"; RFRA defense ultimately rejected because permit found to be a "slight" rather than "substantial" burden); United States v. Gonzales, 957 F. Supp. 1225, 1228 (D.N.M. 1997) (Native American charged with killing bald eagle without permit claimed not only that the killing was necessary for religious ceremony *but also* that the permit process itself burdened his religious practice because it required him to disclose on the application the name of the specific tribal ceremony for which the eagle was sought and to submit proof from a religious elder that he was authorized to participate in the ceremony).

Discharging the directive to "differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud," Patrick, 745 F.2d at 157, the Court finds that, to be generous and charitable, defendant's invocation of religion to

exempt her from the licensing and permit laws is purely pretextual. Three critical features of the record make this conclusion inescapable. The first is the alarming level of calculation and dissembling displayed by defendant on the witness stand, evident as much in her tone and demeanor as in the actual words recorded on the transcript. For example, during the first day of the hearing, defendant's brief *direct* testimony was remarkably straightforward and neatly tailored to her religious exercise claim, but on cross-examination, her temperament, demeanor and capacity to recall all changed abruptly, drastically, and for the worse. Defendant was recalcitrant when questioned about the video that had just been shown of a religious ritual at her church, and was unable to say for certain whether bushmeat was in fact present in the filmed ritual. She also claimed initially not to know whether there were other types of wild animals in Africa, and was similarly evasive when questioned about antelope, warthog and cane rats, and even when shown the affidavit (from her congregation) bearing her signature.

When defendant's cross-examination was resumed three months later, she claimed to have a limited memory and impaired cognitive capacity only when it served her. For example, defendant testified that she could not remember whether she had spoken to Cargo Hut on the day of the shipment's seizure or whether she had spoken to her cousin (the shipper), but also testified that "of course" she *did* remember the smoked fish. When asked about the bushmeat that had been found in her garage in her presence and which she had admitted acquiring (in her interview with Fish & Wildlife agents), defendant's reply was "I'm not an expert, so I won't tell you if there w[ere] primate parts in my garage;" when pressed, she replied, "As I explained to you just now, I'm not an expert; I'm not a bushman. I never went to school to know which part is this or which part is this." A few moments later she revealed that she *did*, in fact, know about bushmeat

in the boxes but said that "it was not a lot." Defendant also frequently responded to the prosecution with cogent retorts such as "what do you mean by other shipments" (when asked about shipments), "you have to make your question simpler, what do you mean by people?" (when asked whether other people in Africa had shipped items to her), and "[p]ut it in simpler English" and "I just answered that" (when asked other straightforward questions).

A second factor supporting this Court's finding that the RFRA defense is asserted as pretext are features of the record that are entirely inconsistent with the RFRA claim. Critical here are the many excuses (reviewed above) that defendant has offered that have nothing to do with her religion and that, on the basis of the facts adduced so far, appear to be possible trial defenses. Notwithstanding the general principle allowing litigants to assert alternative and even contradictory theories, there comes a point, usually after the record is, at it has been here, sufficiently developed, when the inconsistency between claims or defenses necessarily renders one of the incompatible theories wholly untenable. That point has arrived in this case: defendant's claim that she made a good faith effort to comply with the licensing regulations, and that her completing of the incorrect form was mere inadvertence, are entirely incompatible with any contention that religiously motivated efforts to acquire bushmeat blinded her to, or outweighed, her ability or willingness to comply with those same licensing regulations. Such incompatibility necessarily weighs *against* the claim (here, RFRA) for which "sincerity" is an essential element. See Krishna Consciousness v. Barber, 650 F.2d at 441 ("an adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief). In short, the sudden disappearance during cross-examination of defendant's asserted cognitive and memory weaknesses and her overall combative, calculating and dissembling demeanor unfortunately cast

26

a shadow of a most disturbing hue over the entire proceeding, including her invocation of religion to excuse her failure to comply with the *CITES* permitting process, the Fish & Wildlife import license requirement, and the Lacey Act's truth-in-labeling requirements.

Lastly, defendant's final brief on the motion essentially concedes that the RFRA defense was not interposed as a bona fide effort to vindicate defendant's religious exercise rights but as a vehicle through which the Court might exercise what counsel suspected was a disposition toward lenity. The "Final Brief in Support" begins by quoting a statement that the Court made at the close of the hearing: "I'm hearing an argument based on policy, why fire the heavy guns at this woman when there are other alternatives?" The brief then states that "[t]hat is the question" and that "we believe [RFRA] empowers the Court to answer it."

Similarly, the brief makes clear that this case is materially unlike the prototypical Free Exercise case, in which a particular act claimed to be religious in nature (such as killing eagles, smoking peyote, eating mushrooms, or wearing dreadlocks) is engaged in without apology and in open defiance of a law that, the claimant asserts, burdens the First Amendment right. Here, by contrast, the brief concedes that counsel "raised this RFRA defense reluctantly" and "as a defense to an unjust criminal charge for filing the wrong form, not as a justification for smuggling illegal merchandise." The Court cannot discount counsel's own accession to the reality of this case, namely, that it is not about the religiously motivated import of bushmeat but about concealment of the bushmeat through the combination of filings and omissions already reviewed. There is no evidence that there was anything religious about *those* acts.

Thus, even accepting that consumption of bushmeat is a component of defendant's religious beliefs, the inescapable inquiry is, in what manner did those beliefs limit defendant's

willingness or ability to apply for the required import license or to disclose fully the nature of the goods she was importing by completing the required *Form 3-177*? What feature of the record allows the Court to infer that that defendant found herself "in the predicament of choosing between [state] benefits and religious beliefs, " Thomas, 450 U.S. at 719, or of choosing between following the dictates of religious tenets and secular law or, as defendant herself claims, between "practicing [her] faith and going to jail"? Def.'s Mem. of Law 18 (citing Smith, 494 U.S. at 898). The answer is, none.

In sum, because defendant's religious beliefs relating to bushmeat are not the bona fide explanation for the criminal conduct she is charged with committing, the Court concludes that they are not sincerely held for purposes of a RFRA–based dismissal of that criminal charge.

## E. The Court's Earlier Ruling on Standing.

The Court is mindful that defendant has apparently interpreted, mistakenly, the Court's decision to grant her standing to pursue her RFRA claim as a final ruling on the factual question of *de facto* futility and the legal question of "substantial burden." The Court had specifically stated at that time, "I am convinced on the basis of the information before me that she would not be permitted to bring this material into the United States," and that, "it's clear to me that any efforts to lawfully bring this material into the States would have been futile." Tr. Aug. 3, 2007 at 3. The Court further remarked, "[t]hat being the case, I think the substantial burden is almost presumed." Id.

That preliminary and now moot ruling, however, was not a final resolution of any issue in this case, for several reasons. First, the ruling was necessarily provisional because it was made before the evidentiary hearing or the Court's review of the extensive body of secondary literature

submitted in this case. Second, it was a charitable ruling made in the spirit of sparing defendant

the apparent harshness of a premature rejection of her defense before she had had a full

opportunity to develop the record. Given the special regard afforded a constitutional claim

involving personal religious beliefs, the rarity of a prosecution involving bushmeat, and the

Court's relative unfamiliarity at the outset of the litigation with the matters on which the RFRA

claim here turns, the decision to grant standing was entirely appropriate. It was also fully

consistent with the liberal view toward standing encouraged in RFRA litigation. See, e.g., 42

U.S.C. § 2000bb-1(c) (Congress extends standing to assert RFRA claim or defense to

constitutional limit); United States v. Adeyemo, 03-CR-40220, 2008 WL 928546, *2 (N.D. Cal.

Apr. 4, 2008) ("Under RFRA, Defendant need only satisfy general 'case or controversy'

requirement to have standing to assert RFRA as a defense"). Cf. Clearing House Ass'n, LLC. v.

Cuomo, 510 F.3d 105, 125-26 (2d Cir. 2007) (under the Fair Housing Act, where Congress used

the same standing language adopted in RFRA, Court finds "powerful indicators that Congress

intended expansive standing" and is therefore "reluctant to consider arguments for restricting that

standing on the basis of what is at best an incomplete record").

Third, the standing ruling was necessitated only by defendant's temporary expansion of

her claim into a broad, facial challenge to the underlying regulations, and has been rendered moot

now that defendant has settled once again upon a narrower theory challenging only the laws as

applied to her in this prosecution; her standing to do so is of course self-evident, and not

challenged by the government.[15]

---

[15] Furthermore, notwithstanding the Court's provisional accession to the defendant's argument on *de facto* futility for purposes of granting defendant standing, defendant had also argued at that time that, even for purposes of a facial challenge to the regulations themselves,

Fourth and finally, the Court's observation of defendant's demeanor while testifying all but extinguished the Court's willingness to indulge defendant in her claimed religion-based defense. Indeed, the Court had stated on the record its doubts about defendant's sincerity and veracity at the close of the final day of testimony, see Tr. Nov. 13, 2007 at 32, and remarked that, for that reason, the Court's previous ruling on standing was "one that I rethink almost everyday." Tr. Nov. 13, 2007 at 34.

## F. Substantial Burden

The Court's finding of a lack of sincerity in the tendering of the RFRA defense obviates the need, as a formal matter, to reach the question of substantial burden, or to address the elements of the RFRA test ("compelling government interest" and "least restrictive means") on which the government would bear the burden *if* defendant had made her prima facie showing.

The Court is aware, however, that much of the analysis and the thrust of the Court's conclusion on sincerity overlap with the themes addressed in substantial burden analysis, particularly the lack of any nexus between defendant's asserted beliefs about the religious significance of bushmeat consumption and the requirement that she obtain a permit before importing it. The Court therefore concludes, for the reasons already stated but as a distinct, alternative ground for the decision to deny defendant's motion, that plaintiff has failed to make a

---

standing could be established even without a finding of *de facto* futility, relying on <u>United States v. Gonzales</u>, 957 F. Supp. 1225 (D.N.M. 1997) (where defendant charged with failing to submit an application for permit before shooting an eagle for use in a religious ceremony, court treats "facial" and "as applied" challenges to underlying regulation as "virtually identical" and grants standing to defendant to mount both challenges). Were it not rendered moot because of the defendant's final adoption of the narrower constitutional theory, the Court would, in the alternative, modify its standing ruling and rest it, *nunc pro tunc*, on <u>Gonzales</u> rather than *de facto* futility.

prima facie showing that the licensing and permit scheme she is charged with violating imposed a substantial burden on the exercise of her religion. See United States v. Tawahongva, 456 F. Supp.2d at 1127 (permit requirement held to be a "slight" rather than "substantial" burden on free exercise of Native American's religious use of eagles). Nonetheless, in announcing this alternative ground for decision the Court reiterates that it finds the insincerity of defendant's invocation of religion to be her most telling shortcoming.

## CONCLUSION

For all of the foregoing reasons, defendant's motion to dismiss the indictment is denied. Counsel for the defendant and the government are directed to appear for a status conference on January 6, 2009 at 9:30 a.m.

SO ORDERED.

Dated: Brooklyn, New York
      December 3/, 2008

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge
